Next case is Enri Gregory Urbanski et al., 2015, 1272, Mr. Bull. Good morning, if it may please the court, my name is Jonathan Ball, with me is Jennifer Moore. We're with the law firm Greenberg-Troy, and we represent the appellant, Urbanski, in this appeal from the Patent Office. The board below made at least two errors of law in sustaining the rejections of Dr. Urbanski's patent claims under Section 103. The first error of law is that the board relied on a modification of the primary reference, the gross reference. The board relied on a modification which would render gross entirely inoperable for his intended purpose of making stable dispersions of fiber in water. And the second error, the board erred as a matter of law in failing to show that each and every limitation of the claims would have been taught or suggested by the cited references, gross and long, individually or taken together, and the board failed to show that there would have been a reasonable expectation of success in view of those references to achieve the claim limitations of the invention. I'd like to start, if I may, on the inoperability issue. There's really no dispute here, looking at the board's decision, I think there's agreement that the purpose of the gross reference, the primary reference, is to make these stable aqueous dispersions of fiber in water. It's from the abstract to the claims, 30-some-odd mentions in gross, identifying that as the very purpose for carrying out his process. One needs to look no farther than the summary of the invention, which says the very first sentence, the invention pertains to the discovery that insoluble fibers can be converted into stable homogenous colloidal dispersions. In other words, what Gross is doing, he's taking fibers which can't go into water. Is that in the claim? Stable dispersion? Is that in Gross's claim? It is. The prior art is gross, and it talks about the stable dispersions, but Mr. Evans's claim... That's not your claim. No, it doesn't, because in fact, Dr. Evans's claim is the exact opposite. It's the antithesis of a stable homogenous aqueous dispersion. Dr. Evans put in a declaration where he showed through experimental testing that if you took the modification that's proposed here, the Wong modification, which is taking everything about the gross reference and adjusting it only to reduce the reaction time, Gross says five to 72 hours is the appropriate reaction time, but the board would have us take from a different reaction, take a two-hour reaction time and use that in the gross reference. Dr. Evans tested, he made hydrolysates and he tested those to see could you then therefore go ahead and make stable homogenous dispersions according to the gross reference? Is there anything in the gross reference that suggests that using a shorter hydrolysis time would result in no benefits? So I think that the answer is yes, there is. So Gross talks about a degree of hydrolysis and he says, what is an appropriate degree of hydrolysis? I understand that if you use a shorter hydrolysis time, you won't get the dispersion. You won't get the stable gel, but the question I'm asking is, does Gross say, not only are you going to not get my stable gel, but you're not going to get any benefits, you won't yield any benefits at all. So Gross doesn't speak to that point exactly. What Gross does is he outlines for my purpose of making stable homogenous gels, this is what you do. You go from 5 to 72 hours. But a reference speaks to whatever it discloses, even if one of its aspects isn't utilized in what's claimed, the rest of it is. So if I understand the question, I mean the simple fact of the matter is Gross is inoperable. If you take this modification, if you use two hours and you do it in Gross, you simply cannot produce these stable homogenous colloidal dispersions. But that's not in the claim before us. It's not in the claim before us because we have the exact opposite situation, your honor. We have a process for making a very specific process with very narrowly claimed process parameters and to make a very specific product. That product is defined in terms of certain key characteristics and Dr. Urbanski states in his declaration that those do not make stable homogenous dispersions and the board accepts that as true. That's one of the board's factual findings is they accept as true the facts stated in the Urbanski declaration including that. The board acknowledges elsewhere that practicing the Wong modification of Gross comes at the expense of the very objective. But if you don't care about having a stable dispersion, you care about other aspects of what Gross points you to, why does it matter that you can't get a stable dispersion without the length of hydrolysis that Gross suggests? Because I don't think anyone would ever practice the Gross method for any reason other than making a stable homogenous dispersion. The very first sentence of the detailed description says the present invention pertains to a stable homogenous colloidal dispersion. But the question is what Gross teaches, we're not talking about the operability of the Gross invention, we're talking about what Gross teaches in relation, plus Wong, in relation to what's claimed here. So I would submit that it's only with hindsight, the only conceivable way that one could take particular reaction parameters, particular enzymes, particular conditions, etc. from his reaction, which is for this purpose, but do it for a purpose which is mutually exclusive. And the board said that. The board said the Wong reaction may be mutually exclusive to the Gross reaction. The only way someone practices something that says the invention is a stable homogenous colloidal dispersion in a mutually exclusive way is through hindsight. You said you had a second point, too. Yes, so I'll move on to that, but if I could very quickly, this court's case law consistently holds in these situations, in the McGinley-Franklin sports case, the court articulated the standard that when there's inoperability of the combination, it cannot serve as a predicate. We looked for every case we could find from this court where there was inoperability for the intended purpose of the prior art, and could not find one case where there was an obvious misdetermination, even in the face of inoperability, and the PTO doesn't point to a single case for that. I think that would be a novel and remarkable proposition if a prior art combination could be completely rendered inoperable, but yet there would still be a final ... I'll move on to the next ... Let me give you a hypothetical example that strikes me as maybe falling into this category. Suppose that your invention is a mild ... You're looking for a mild explosive, something that will blow rocks off the side of a highway, but not destroy the mountain. You come up with an invention, a chemical formulation, and you say, okay, here's the formulation. Now, whatever you do, don't add sodium, more than X amount of sodium to this, or it will blow the entire mountain up, so don't do that. But the military is interested in something that blows up mountains, so it looks at that and says, terrific. We've just been taught how to make a terrific explosive. Why isn't that obvious from your invention, notwithstanding that you were saying, don't add the sodium? I think in that case, that's a clear teaching away, and that's a ... You mean there would be no obviousness in my case? Well, the In Ray Gurley case tells us that one must look at the nature of the teaching, and that a teaching away is a useful general rule, a reference which teaches away, cannot render a claim obvious. But you need to look at the nature of the teaching, and if it just teaches that it's inferior, or maybe less desirable, then that may not be enough to lead to a finding of non-obviousness. But where it is ... It would be absolutely, completely inconsistent with the purpose of the invention, which is this mild explosive. Nonetheless, it's telling you in so many words, explicitly, here's how to make one half of a bomb. Why wouldn't that be obvious? Why wouldn't a bomb be obvious from that? If the reference itself is leading you away from, leading one skill in the art away from that, and if the reference itself is saying, don't do this, that is the classic example of a teaching away. So you're saying it would not be obvious in my hypothetical case? In the case that you presented, I believe it would be non-obvious, because it is a teaching away, but that doesn't present the issue of inoperability. This is an issue of not just the express teaching away, or the disclosures of a reference, which say, that's probably not going to be a useful avenue of research. I don't understand your point about inoperability. Let me move on to the specific limitations of the claims, if I may. I'll start with the first point that's raised in our brief, which is the 1% pre-simple sugar content of the claim. So Dr. Urbanski's patent claim requires that when this hydrolysis reaction is carried out, the resulting hydrolysate, the hydrolyzed modified fiber, will have a pre-simple sugar content, such as glucose, of less than 1% of that mixture. And that's just not in this prior art at all. The gross reference, the primary reference, says 11% to 15% is the amount of pre-simple sugar content. And that's not just an abstract teaching. That is the very marker that Gross says you look for to know when you've hydrolyzed enough to get the stable homogenous dispersion. So at 5 to 72 hours, 11% to 15% sugar content, Gross says, that's good. You've achieved my invention. You've achieved a stable homogenous dispersion. So as an initial matter, there's nothing in Gross that says get down all the way to less than 1%. Gross is saying 11% to 15%. Now, Wong can't cure that because Wong doesn't talk about the sugar content. It's completely silent. These facts aren't in dispute. The board, as a final fact, recognizes that Gross says 11% to 15% and that Wong is silent on the issue. I guess the idea behind the rejection is that if you use Wong's recommended hydrolysis time, let's say one and two-thirds hours, you will yield a sugar content that meets your claim sugar content. I would suggest, Your Honor, that that is the PTO, the solicitor's point in their brief that it would occur exactly as you're saying. But that's a newly minted argument from counsel in their brief because that's not what the board said. The board's only discussion of this issue is A10. It's page nine of the board's decision, page A10. And the board simply says that the modification would, quote, result in a lower pre-simple sugar content. But that's not what the claim requires. Lower than 11%. Your Honor, you're into your rebuttal time. I assume you wish to save it. Yeah, let me just, if I may, just wrap up that point. The law requires a reasonable expectation of success of the claimed invention. The Par Pharma case from this court from last year says exactly that. It's not just whether it would be lower. It's whether it would be the claimed degree. So the board here just doesn't address it at all. There's a single paragraph, and that's it. I'll leave it at that. Thank you. Ms. Nelson for the PTO. Thank you, Judge Lurie. May it please the court. I'll begin by addressing inoperability, because that seems to be what Hrabowski is focused on and what they were focused on in the reply brief. And I have three points I want to make about inoperability. The first is that these inoperability cases are a useful construct in analyzing the obviousness of adding a component into a mechanical device, which is what all the cases actually concern. This inoperability principle has never been applied to analyze the obviousness of varying a parameter in a chemical method where that parameter is known to be a result-effective variable. In that context, this court's cases in applied materials and Peterson is a more appropriate way to look at the obviousness analysis. The second point I'd like to make is I'd like to refer the court to the Icon Health case, which I think is useful. Notably, the Icon Health case is the only case cited in the briefs post-KSR, the precedential case post-KSR. But nevertheless, it says a couple things I think is important, and it actually kind of follows through with what you had said, Judge Lurie. One of the things they say is that the scope of the claim is critical, that when the claim is broad, an inoperability argument is less persuasive. Secondly, a related point that they make is when they're looking at the intended purpose, they're looking at the applicant's intended purpose, ICON's intended purpose. I think that's important here because their claims are not limited to producing a stable hydrolysis, but simply to making a fiber hydrolysis. If anything, their intended purpose, if you look to their specification, is really about getting reduced water holding capacity. Actually, I think it's sort of as proof of purpose here that their view of the intended purpose is overly narrow. If the examiner were to have flipped the references, which I think they very easily could have done, because Wong, in fact, in column three, teaches almost all of the claimed method steps, and then simply substitutes in what wasn't taught at Wong from Gross, you would not have this inoperability problem. And the third point I'd like to make is that inoperability is a tool for analyzing teaching away, and here the board and the examiner's analysis of teaching away was proper. They found that Urbanski's arguments were focused entirely on Gross, which this court has said is improper when the rejection is based on Gross and Wong. Secondly, like as Judge Chen observed, the board saw that in Gross there's nothing that actually disparages or discourages one from using a shorter reaction time. And finally, they observed that Wong provides a teaching toward using a shorter reaction time, and provides a good reason for doing so. Finally, I'd just like to finish by saying that this court has, from time to time, cautioned against trying to squeeze factual patterns into pre-established pigeonholes when the ultimate analysis is really about obviousness, and I think that's exactly what Urbanski is trying to do here by trying to sort of squeeze this factual pattern into this inoperability rule, where the better rule here is about result-effective variables. Turning now to his point about the properties that are claimed in the claim, there's the water-holding capacity and the simple sugar. He focuses on the simple sugar, as the board and the examiner both observed. And if you looked at the claim, it's fairly clear that by practicing the method steps, by the structure of the claim, it indicates that you would achieve these properties. With respect to the simple sugar content, indeed, as Urbanski says, Gross teaches 11% to 15%, and by shortening the reaction time, one would expect to achieve a smaller percentage of simple sugars. And in fact, Gross teaches something important. Not only do they teach that with 572 hours that you get a sugar content of about 11% to 15%, but actually early on in the specification, at A490, they talk about the prior studies where they actually completely hydrolyzed the cellulose, and they end up with a sugar solution. So it basically sort of teaches that that's really what hydrolysis is all about. You're basically taking these fiber molecules, and you're cutting them up. And at some point, if you cut enough, you end up with just a sugar solution. So obviously, if you cut less, you'll end up with a much smaller percentage of simple sugars. And I guess I just want to finish the last point, although he didn't focus as much on water-holding capacity, although he did say that his claims were narrowly drafted to these particular properties. The water-holding capacity, it's actually worth mentioning that both with respect to simple sugars and water-holding capacities, the claims ranges, there's nothing magic about them. And if you look to the specification, they haven't taught anything special about those ranges or any way to achieve them that is different than simply just following these methods, steps. In fact, if you look to their discussion of worth noting that A40 and 45, when they talk about water-holding capacity, they talk basically about achieving water-holding capacity of 10% or at least 10%, at least 15%, at least 20%, and so on to up to 50%. And this limitation, 10% to 35%, was brought in in response to the examiner's rejection at A231 of the record, simply as an attempt to overcome, at that time, a rejection based on growth alone. So it's not really a narrowly drafted range, it's simply an attempt by Urbanski to try to overcome the teachings of growth, which we submit, or clearly render the invention obvious. If there are no further questions... Thank you, Ms. Nelson. We'll all have a couple of minutes. Thank you. I'd like to make just three quick points to address what the solicitor said. One, I heard a statement that allegedly the examiner and the board found that Wong, the secondary reference, teaches the steps of Dr. Urbanski's claims, and that's just not true. There's nothing in the record where the examiner ever did a comparison between the Wong reaction and Dr. Urbanski's patent claim. And if you look at the board's decision, it's just not there. The only thing the board says is it refers to a temperature of Wong, but that's it. None of the important parameters that Dr. Urbanski identifies, in terms of the enzymes, the concentration of the enzymes, the concentrations of the fibers, the heating, the temperature, on and on, the pH, none of that is addressed by the board or the examiner with respect to Wong, so that's just simply incorrect. The issue about ICON, and it was said that ICON makes clear that it is the applicant's purpose that matters, not the purpose of the prior art for inoperability. And the ICON case is a different type of case. That's U.S.B. Adams. That's a separate tried and true principle that an inoperable combination for what we're claiming also can't be used to show obviousness or anticipation. This is the In re Gordon principle. It was recently affirmed in PLASPAC earlier this year in the unpublished PLASPAC decision, and it's where the modification renders the prior art inoperable for the prior art's purpose. So, for example, in PLASPAC, what was at issue was a device for filling a material into a thin crack on a surface. The modification would have added a spray nozzle to that, and what this court said is that that renders that prior art unsuitable for its intended purpose of filling in just a single crack without spraying it everywhere. So, in In re Gordon's, the attack's in situation. In PLASPAC, that was a case where we deferred to the lower tribunal's fact finding on that. In PLASPAC, there was a... There was a substantial evidence standard to review, just like there's a substantial evidence standard reviewed here. There's no doubt about that. The court affirmed the board's finding for failure to open up an IPR, I believe it was, in that case, finding that the references would render it unsuitable. It's just merely an acknowledgment from this court that that is the standard, and that standard is alive and well post-KSR, certainly on that. And then I'd just like to say that the solicitor said the structure of the claims shows that these properties that Dr. Abanski has claimed somehow naturally result or inherently result from carrying this out. And that's just not the case. We know from Gross that his enzymes give you a very large level of simple sugars. We know it's not the case that it intrinsically produces it, but more importantly, the board did not make that argument. That's counsel's argument. That was not the board's argument. And the 1% limitation, that was added by amendment. It previously was 5%. So it's no more intrinsic or inherent that when you carry it out, you get 5% than it is 1%. That argument doesn't make sense. This is a very narrowly defined patent claim with less than 1% pre-simple sugar. The board doesn't address it. It just says lower. Thank you.